Bn.ocKKTNrBROU'GH, J.
I concur with my brother Cabell, in the view he has taken of this preliminary question. The appellant’s counsel must be heard upon his objections to the original decree, considered in connexion with the new evidence and proceedings on Laidletfs bill. It is true that in the bill itself he calls it a bill of review, yet as the decree which he seeks to have reviewed is interlocutory only, and not final, it cannot be looked on as a bill of review, properly so called. But it may and must be regarded as a supplemental bill in nature of a *356 bill of review. Such a bill, though it does no't ask that . the former decree may be reviewed and reversed, yet prays that the cause may be heard with respect to the new matter made the subject of the supplemental bill, at the same time that it is reheard upon the original bill, and that the plaintiff may have such relief as the nature of the case made by the supplemental bill requires. Mitf. Pleadi 4th edi. p. 91. Courts of equity regard substance rather than form, and may, I think, so mould the pleadings and proceedings as to attain the real justice of the case. The bill before us, although it improperly prays that the former decree may be reviewed and reversed, makes a new case, and prays for an opportunity to introduce new testimony, and to be relieved in the premises according to equity.
The cause was then argued upon its merits, and several questions were discussed—I. Whether, as Laidley’s covenant with Wilson of March 1814, bound him to give a mortgage for the debts therein mentioned, only in case Hanway and Brooke’s suit against him should be decided in his favour, or their bill against him should be dismissed,—that bill had been so dismissed as the covenant intended it should be, before he should give the mortgage ? whether the casus foederis had occurred or not ? II. Whether the receipt which Laidley had obtained from Thoebe Merrifield in full of the judgment of Merrfield’s administrators against him, was, under the circumstances of the case, a good acquittance of the judgment? If not of the whole judgment, whether the payment of 70 dollars which he actually made to her ought to be credited to him or not ? III. Whether the chancellor did not err in allowing interest on the judgment of Merrfield’s administrators, that judgment not itself giving running interest, or, at least, in allowing interest on the damages or interest and costs, included in the judgment, as well as on the debt ? On the last point, *357 the cases of Beall v. Silver, 2 Rand. 401. and Mercer’s adm’r v. Beale, 4 Leigh 189. were cited.
Carr, J.
According to the letter of the covenant between Laidley and Wilson of March 1814, by which the former bound himself to give the mortgage, in case the suit of Hanway and Brooke against him should be dismissed, the casus foederis had occurred; for the suit was dismissed. But it was not dismissed on a hearing; it was dismissed by order of one plaintiff, and by consent of the counsel for the other: and the question is, whether such dismission of that suit was a dismission within the spirit and meaning of the covenant f Hanway deposed, that he never had been, and never expected to be, instructed by Reid SfFord to renew the suit, and he did not intend to renew it; and in fact it has never been renewed during the long time which has since elapsed. Thus, by the dismission of the suit, Laidley has had the full benefit of Wilson’s services, which was the consideration upon which he covenanted to give the mortgage. Therefore, I think, we may well conclude, that according to the substantial purpose and meaning of the covenant, as well as the letter, the casus foederis did occur, and that Laidley was bound to give the mortgage; especially wdien it is considered that the mortgage he contracted to give was a mortgage to secure payment of his own -just debts; and that if the actual dismission of the suit was not enough to bind him to give the mortgage, it put it out of Wilson’s power to obtain any other dismission.
As to the receipt which Laidley procured from P'haibe Merrifield in full of the judgment of Merrifi,eld’s administrators against him, it was hardly denied in the argument, that it was fraudulent; but it was contended, that it was a fraud practised by Laidley on her, not a fraudulent combination of him and her to defraud Samuel Merrifield, the acting and responsible administra *358 tor; and that, as she had authority to receive and give ' , an acquittance for the whole debt, the partial payment to her of 70 dollars was good, and .Laidley ought at least to have a credit for that payment. Upon a careful examination of the proofs, I am convinced, that the transaction was a fraudulent collusion between Laidley and Phoebe Merrifield, whereby she obtained from him 70 dollars for her own use, and he got an acquittance of the whole judgment: he bribed her to betray the interests of her intestate’s estate, and to unite with, him in defrauding Samuel Merrifield, whom they both knew to be the acting and responsible administrator. [Here, the judge stated and examined the evidence on the point]. With this opinion of the state of facts, I cannot agree that Laidley shall have credit for the payment of 70 dollars ; for to allow him the credit, would be to •aid the parties to the fraud, to effect their purpose pro tanto.
The remaining question is, whether the chancellor erred in allowing interest on the aggregate amount of the debt and costs due by the judgment ? Here was the sum of 264 dollars due by the judgment (call it debt, damages, interest, costs—what you will) which Laidley, on the 8th March 1814, acknowledged he owed, and mortgaged his land to pay. Need I refer to cases to shew that when the court of equity comes to decree payment of this debt, and a foreclosure &c. it will give interest on the whole ? Does it matter what are the elements of which it is composed, and how the different items originated P when under his seal the debtor has acknowledged it all, as one debt, and bound his property to secure it. But suppose we still take it as a judgment composed of principal and costs, and this a bill to enforce it in equity: the cases of Chamberlayne v. Temple and Beall v. Silver shew, that in such cases equity will give interest on the whole aggregate amount, though sounding in damages, and carrying no interest *359 at law. Nor does the case of Mercer v. Beale depart, in the slightest degree, from this doctrine: on the contrary it is expressly laid down there, that equity will (as a general rule) give interest on judgments; and further, the chancellor, in that case, decreed interest on the whole of the judgment unpaid at the filing of the bill, from the date of the judgment, and this court affirmed that decree. The point in question there, was of a different kind. The judgment, as it stood at law, bearing no interest, payments were made between 1802 and 1809, reducing it from ¿£2500. to 614 dollars; in 1816 (seven years after the judgment was thus reduced) a bill was filed to enforce the payment of the balance ; and it was contended, in the argument here, that the court of equity should have treated this judgment exactly a.s if it had carried running interest on its face, computing interest on it to the time of the payments, and applying the payments first to the discharge of the interest. The two judges who gave opinions in the case thought, that as there was but one debt (the judgment at law) each payment must of necessity be made to it, and deducted from it at the date when made ; and that the circumstance of filing a bill afterwards, could not authorize a change in the application of these payments, and applying them to a debt which did not exist when they were made, and which it could not then have been known would ever exist. This doctrine, I still think, stands on a stable foundation; but does-not touch at all the general question we are now considering.
Upon the whole I am for affirming both decrees, in omnibus.